Filed 8/17/16  In re D.Q. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.Q. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065396 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J260228 & J260229) |
| v. | OPINION |
| L.M. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander and Lynn M. Poncin, Judges.*  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant L.M. (mother).

---

* Judge Alexander ruled on the termination of parental rights at the hearing held February 5, 2016, while Judge Poncin ruled on the petition for modification, filed December 21, 2015.

1

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant L.Q. (father).

Jean-Rene Basle, County Counsel, and Jamila Bauyati, Deputy County Counsel, for Plaintiff and Respondent.

Appellants L.M. and L.Q. are the parents of two children, D.Q. and U.Q., (children) who were ages three and four, respectively, on the date of the challenged orders. Both parents argue the juvenile court erred when it terminated each parent's parental rights to these two children, at a hearing held on February 5, 2016, pursuant to Welfare and Institutions Code section 366.26, because they established that the parental bond exception to the presumption for adoption applies here.[1] In addition, father argues the court erred when it denied his petition for modification, filed under section 388, without holding an evidentiary hearing. Mother joins in this argument. For the reasons discussed below, we find no error and affirm.

FACTS AND PROCEDURE

In March or April 2015, the parents and children moved to San Bernardino County from Stanislaus County. The children, along with their older half-brother T.P,[2] had been

---

[1] Section references are to the Welfare and Institutions Code except where otherwise indicated.

[2] T.P. was born in 2008 and is not a subject of this appeal. The parents' extremely disturbing treatment of him is the main basis for the two separate dependency cases regarding his half-siblings, D.Q. and U.Q. Since T.P. was two years old, CPS in Stanislaus County had received six separate referrals about father physically abusing T.P. and the parents neglecting T.P. In January 2013, when T.P. was four years old, the dependency case in Stanislaus County for all three children was triggered when mother

*[footnote continued on next page]*

removed from the parents' care in Stanislaus County in January 2013. The children were returned to the parents in late 2014. On January 30, 2015, T.P. was also placed in the home in a "trial" visit or placement with mother. The San Bernardino Superior Court accepted the transfer of their juvenile dependency case.

In April 2015, Children and Family Services (CFS) sent a social worker to the family's Barstow home for an initial home assessment. The parents and social worker discussed T.P. and mother expressed concern about his behavior – he had recently exposed himself to other children on the school bus, hit his teacher and other children, and hit mother. Mother stated that she did spank T.P. D.Q. and U.Q. were in the home and did not have any injuries or bruises. Three-year-old U.Q.'s feet were caked with dirt that mother could not remove using multiple baby wipes. The home was dirty, with trash on the floor. Each bedroom had mattresses on the floor and clothes all over. The kitchen had no refrigerator; mother stated it was outside because it had roaches from the person

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
took T.P. to a hospital to obtain a psychological evaluation. Mother stated T.P. had grabbed a knife and threatened to kill himself and other family members. T.P. had previously received mental health services but mother had stopped taking him to appointments. T.P. was found to be extensively covered in bruises and injuries, both old and new. T.P. and the children D.Q. and U.Q., then ages four months and one year respectively, were immediately removed. The juvenile court found true allegations that father physically and sexually abused T.P., that mother failed to protect him, and that D.Q. and U.Q. were at risk because of this abuse. In a status review report in March 2014, the social worker reported: "The abuse . . . [T.P.] endured in his short life has already had a lasting effect. . . . [H]e continues to show extreme dislike for . . . [father]. The effects of the abuse have caused . . . [T.P.] to become aggressive towards adults and school staff."

who gave it to them. The little food available to the children was kept in the garage and, according to the social worker, "there did not appear to be much."

After T.P. got out of school that day, mother brought him to the CFS office as requested. T.P. had extensive bruising all over his body. He initially stated he got the bruising from fights at school, but eventually stated that mother hit him with a paddle and that father hits him too. T.P. was removed immediately and placed in a group home.

On May 5, 2015, mother came to the CFS office. The social worker told mother that CFS was concerned about D.Q. and U.Q.'s safety in the home because of T.P.'s injuries, because T.P. was acting out sexually, and because father was still in the home despite having sexually and physically abused T.P. Mother became upset and said she would like to sign away her rights to T.P. because his problems were involving her other two children. When the social worker asked to have the children examined for signs of injury, mother became extremely volatile and left, stating "you will not see my kids because they won't be here."

Because CFS staff believed mother was a flight risk,[3] the social worker went to the home with a law enforcement officer to take the children into protective custody. Mother locked herself into a bedroom with the children and would not come out. Father yelled and cursed at both the social worker and the children. Several additional law enforcement officers responded and threatened to arrest the parents if they did not calm down. After some actual tug-of-war between mom and the social worker while handing

---

[3] Mother had reportedly fled to Montana from California in 2008 to avoid having children removed.

over the children, the children were taken into custody. The social worker reported the children said goodbye to their parents but "did not cry or appear to be upset." The social worker later described the children as "frightened and very confused as to why their home was filled with several police officers." Two-year-old D.Q. was found to have two circular bruises on his arm and a long scratch on his back.

On May 7, 2015, CFS filed section 300 petitions regarding D.Q. and U.Q., alleging facts under four separate subdivisions: (a), serious physical harm, in that the children were at risk of physical abuse because the parents had abused their half-brother, T.P; (b), failure to protect, in that each parent has a history of substance abuse, which caused them to be unable to adequately care for the children, and domestic violence, which placed the children at risk of harm; (d), sexual abuse, in that father sexually abused the children's half-brother T.P. and mother failed to protect him, thus placing the children at risk of sexual abuse; and (j), abuse of sibling, in that mother had previously lost parental rights to three of the children's half-siblings,[4] and the children and T.P. had been through dependency once before in Stanislaus County, but had to be re-removed from the parents' custody in San Bernardino County because of additional physical abuse.

---

[4] Mother's reunification services for three other children were terminated in 2006 and she subsequently lost her parental rights. Father had lost custody of two other children. Mother's very extensive child welfare history dates back to 1998, spans four separate California counties plus the state of Montana, and includes numerous referrals for domestic violence and neglecting her very young children, including keeping a "dirty, nasty house," allowing the children to be filthy and lice-infested, not dressing them for cold weather, and not having enough food in the home.

At the detention hearing held on May 8, 2015, the juvenile court detained the children in foster care and ordered visits at least weekly.

The jurisdiction and disposition report dated May 29, 2015, included details about the abuse T.P. had suffered, listing 13 separate injuries. The extent of the injuries caused the examining physician to initially ask whether T.P. had been in an automobile accident. T.P. confirmed that he had been hit with a paddle, and on the head with a belt buckle. He also confirmed that both mother and father hit him. Mother emphasized several times that she did not know spanking was against the law, despite the services she had received in Stanislaus County. Father's drug test was positive for opiates despite his denial that he currently used drugs. He also denied being the sexual perpetrator against T.P., despite the findings in the previous dependency. Mother also denied that father had sexually abused T.P., emphasizing that no criminal charges were filed. In general, both parents denied any responsibility for the harm that had come to T.P., other than spanking him. The parents visited with D.Q. and U.Q. regularly twice each week. The children appeared interested in playing with the toys in the CFS office, but not that interested in being with their parents. The parents asked inappropriate questions of the visit supervisor and made inappropriate comments to the children, causing them to be upset after visits. The children told the social worker that mother said T.P. was bad and was not coming home, and that no one likes T.P. and he will never come back home. U.Q. also made these comments to T.P. during a sibling visit. CFS recommended no reunifications services for either parent and asked the court to set a permanency planning hearing under section 366.26.

At the jurisdiction hearing held on June 23, 2015, the juvenile court found true the allegations in subdivision (a) regarding the risk of physical harm because the parents had abused T.P, and subdivision (j), abuse of sibling, modified to remove the allegations of sexual abuse. At the request of CFS, the court dismissed the failure to protect allegations under subdivision (b) and the sexual abuse allegations under subdivision (d). As requested by CFS, the court attached to the jurisdiction report the status review reports from Stanislaus County.

On June 23, 2015, the juvenile court terminated mother's reunification services to T.P. and set a section 366.26 permanent plan review hearing.

At the disposition hearing for D.Q. and U.Q. held on July 16, 2015, the court formally removed the children from mother and father, and denied the parents reunification services under section 361.5, subdivision (b). The court set a section 366.26 permanent plan review hearing at which it would consider terminating mother's and father's parental rights to D.Q. and U.Q. Visits were reduced to two hours, once per month.

Also on July 16, 2015, the parents filed notices of intent to file writ petitions challenging the court's orders. This court dismissed their non-issue writs in August 2015.

CFS filed a section 366.26 hearing report on November 6, 2015. The children were moved to a new concurrent planning foster home on October 6, 2015. At that time, both children began wetting themselves. The parents visited consistently once per month and acted appropriately. The social worker noted, "The children transition well at the end

7

of the visit back to the care of their prospective adoptive parents. At the request of CFS, the juvenile court continued the section 366.26 hearing to allow the children to adjust to their new home.

In an addendum report filed December 14, 2015, the social worker noted the children had adjusted to their new home and were no longer wetting themselves or throwing temper tantrums. They called the prospective adoptive parents "Mom" and "Dad." CFS recommended the children be freed for adoption.

On December 21, 2015, father filed a section 388 petition asking for reunification services and increased visits, or in the alternative return of the children on family maintenance. Father stated in his petition that the changed circumstances were that he diligently visited with the children, had attended classes to address domestic violence, anger management, parenting skills, and engaged in individual counseling. He attached copies of participation certificates for 12 weeks of each of the three classes. Father argued the requested action would be better for the children because he had raised them from birth to removal, had previously successfully reunited with them, and the latest removal was "collateral to a sibling matter." The juvenile court summarily denied the petition on December 23, 2015, on the bases that: (1) the petition does not state new evidence or change of circumstances; (2) the change would not be in the children's best interest; and (3) father submitted no evidence that he had actually benefited from the classes and counseling, such as progress reports or letters from a counselor or therapist indicating that father had resolved the issues that led to the children's removal.

8

CFS filed a report on December 31, 2015, recommending parental rights be terminated so the children could be freed from adoption. CFS also recommended denial of father's section 388 petition, although the juvenile court had already denied the petition on December 23. CFS reported that, when the children were seen in May 2015 at the Children Assessment Center after being detained, they were found to be "severely malnourished and lacking social skills."

On February 2, 2016, CFS filed an "Additional Information to the Court" form describing some of the supervised visits. The children typically were excited to play with the toys in the visitation room, but were not excited to see the parents and not sad at the end of visits. The social worker described the visits as "more of a play date, and an inconvenience for the children rather than positive memories." The parents became angry at one of the visits and threatened the social worker, called her names, used foul language, stated they know where she lives, and had D.Q. take pictures of her and other staff members with father's cell phone.

The section 366.26 hearing was held on February 5, 2016. After hearing testimony from the social worker, mother and father, the court terminated parental rights and selected adoption as the children's permanent plan.

Both parents appealed.

DISCUSSION

*1. Father's Section 388 Petition*

Father argues the juvenile court abused its discretion when it denied his petition to modify a court order without first holding an evidentiary hearing. CFS first contends father forfeited the issue because he did not appeal from it separately or mention it in his notice of appeal from the section 366.26 orders. In this instance, we conclude the right of appeal should be liberally construed to protect the appellant. (*In re Joshua S.* (2007) 41 Cal.4th 261, 272; *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1149-1451.)

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both a '"legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

A parent must have a prima facie showing under section 388 to trigger the right to a hearing. (§ 388, subd. (d); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250; Cal. Rules of court, rule 5.570(h).) "'There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence; AND (2) that revoking the previous order would be in the best interests of the children.'" (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079, capitalization altered.) A prima facie showing is made if the liberally

10

construed allegations of the petition show *both* changed circumstances *and* that the best interests of the child may be promoted by petitioner's proposed change of order. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431-432.) Merely changing circumstances is insufficient. (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.)

A juvenile court's summary denial of a section 388 petition is reviewed on appeal for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "'The denial of a section 388 motion rarely merits reversal as an abuse of discretion.' [Citation.]" (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.)

"It is only common sense that in considering whether a juvenile court abuses its discretion in denying a section 388 motion, the gravity of the problem leading to the dependency, and the reason that problem was not overcome by the final review, must be taken into account." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. omitted.)

Here, father failed to make a prima facie showing of changed circumstances. He stated in his petition that he had visited the children regularly, which he did do. After the disposition hearing on July 16, 2015, father completed classes in anger management,

11

parenting and domestic violence prevention,[5] as evidenced by certificates of participation, as well as individual counseling.  However, as the juvenile court notes in its decision, father did not submit any letters or progress reports from counselors or therapists to show that he actually benefited from the classes.  This was especially important to establishing a prima facie case of changed circumstances, given that father had already failed to benefit from the services he received during the previous dependency in Stanislaus County for the same issues.  In that previous case, father, who was already a registered sex offender, participated in an anger management program and a parenting class, and was referred for sexual abuse counseling.  This demonstrated failure to cease his abusive behavior after having received services aimed at preventing the recurrence of abuse is why father's inclusion of these certificates with the section 388 petition, without more, is inadequate to establish a prima facie case that his circumstances had genuinely changed.  We need not address the second prong of the section 388 analysis, the best interests of the children, because father did not establish the first prong, changed circumstances.

---

[5]  The certificates are dated, respectively, August 25 and 19, and September 17, 2015, approximately four and eight weeks after the disposition hearing, and so father apparently began attending the 12-week classes before the disposition hearing.

*2   The Juvenile Court Properly Found There Was Not a Beneficial Parent-Child Relationship.*

Each parent argues the juvenile court erred in terminating their parental rights where substantial evidence supported application of the beneficial-relationship exception to section 366.26.  We disagree.

Section 366.26, subdivision (c)(1), provides that if the court determines, based on the [adoption] assessment and any other relevant evidence, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption, unless one of several statutory exceptions applies.  Once the court determines a child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental under one of the exceptions listed in section 366.26, subdivision (c)(1)(B).  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809, citing *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)  "We must affirm a trial court's rejection of these exceptions if the ruling is supported by substantial evidence.  (*In re Zachary G., supra,* at p. 809.)

One such exception applies when the court finds a compelling reason for determining that termination would be detrimental to the child because the parents have maintained regular visitation and contact with the child, and the child would benefit from continuing the relationship.  (§ 366.26, subd. (c)(1)(B)(i).)  This exception applies only when the relationship with a natural parent promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with

13

new, adoptive parents. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) A parent's "frequent and loving contact" with the child was not enough to sustain a finding that the exception would apply, when the parents "had not occupied a parental role in relation to them at any time during their lives." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The determination of whether a beneficial parent-child relationship exists is reviewed for substantial evidence. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

To establish that the parents have occupied a "parental role," it is not necessary for a parent to show day-to-day contact and interaction. (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Instead, the court determines whether the parent has maintained a parental relationship, or an emotionally significant relationship, with the child, through consistent contact and visitation. (*In re S.B., supra,* 164 Cal.App.4th at pp. 298, 300-301.)

Thus, "[t]o overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B., supra,* 97 Cal.App.4th at p. 466, citing *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342.) "The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and

14

(4) the child's particular needs." (*In re Angel B., supra*, 97 Cal.App.4th at p. 467, fn. omitted; see also, *In re Bailey J., supra,* 189 Cal.App.4th at p. 1315.)

In making its determination, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.)

Here, the children were ages three and four on the date of the section 366.26 hearing, and each had spent about 30 months, more than half of their lives, out of the parents' care between the two dependencies, from January 2013 to October 2014 and again May 2015 to February 2016.

As for the positive or negative effects of the interaction between the parents and the children, we agree with CFS that the effect of the interaction was more or less neutral. The social worker reported that the children were more excited to play with the toys in the visitation room than to see their parents, and they did not have trouble separating from the parents at the end of visits. Regarding the children's particular needs, the evidence presented in the reports and at the section 366.26 hearing was that the children needed a stable, permanent environment. The parents had twice been unable to provide this stability when the children were removed during the two dependencies. The

15

adoption report established that the prospective adoptive parents were fit parental figures, able to provide a stable home and were committed to parenting the children on a permanent basis. The children, after suffering through two dependencies and multiple placement changes, had adjusted to the prospective adoptive home after having initially wet themselves and thrown temper tantrums because of the latest move.

On this record, neither parent is able to show that any minimal benefit either child would derive from continuing the parent-child bond in a less-than-permanent placement outweighs the benefit the children would receive from being placed in a permanent, stable and loving home. The juvenile court did not err.

## DISPOSITION

The juvenile court's orders are affirmed. Mother's request for judicial notice, filed April 18, 2016, is denied as not necessary to the resolution of this appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ                    
                                                P. J.

We concur:

HOLLENHORST          
                    J.

CODRINGTON          
                    J.

16